STATE OF CONNECTICUT EX REL. RICHARD
GREGAN, ANIMAL CONTROL OFFICER
*v.* CHRISTINE KOCZUR
(SC 18058)

Rogers, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued March 10—officially released June 3, 2008

*William S. Palmieri*, for the appellant (defendant).

*Jose A. Suarez*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Kimberly P. Massicotte*, assistant attorney general, for the appellee (plaintiff).

*Opinion*

ROGERS, C. J. The plaintiff, the state of Connecticut, brought this action pursuant to General Statutes (Rev. to 2005) § 22-329a[1] against the defendant, Christine Koczur, seeking orders declaring that the defendant had

---

[1] General Statutes (Rev. to 2005) § 22-329a provides in relevant part: "(a) The Chief Animal Control Officer, any animal control officer or any municipal or regional animal control officer may lawfully take charge of any animal found neglected or cruelly treated, in violation of sections 22-366, 22-415 and 53-247 to 53-252, inclusive, and shall thereupon proceed as provided in subsection (b) of this section . . . .

"(b) Such officer shall file with the superior court which has venue over such matter a verified petition plainly stating such facts as to bring such animal within the jurisdiction of the court and praying for appropriate action by the court in accordance with the provisions of this section. Upon the filing of such petition the court shall cause a summons to be issued requiring the owner or owners or person having responsibility for the care of the animal, if known, to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing. If the owner or owners or person having responsibility for the care of the animal is not known, notice of the time and place of the hearing shall be given by publication in a newspaper having a circulation in the town in which such officer took charge of such animal not less than fourteen days before the date of the hearing. Such court shall further give notice to the petitioner of the time and place of the hearing not less than fourteen days before the date of the hearing.

neglected or cruelly treated certain cats in her possession and vesting permanent custody of the cats with the department of agriculture (department). After a trial to the court, the trial court rendered judgment for the state. The defendant then filed this appeal[2] claiming that: (1) the court improperly determined that she had neglected the cats under § 22-329a; and (2) § 22-329a is unconstitutionally vague. We affirm the judgment of the trial court.

The trial court found the following facts. On January 11, 2006, Richard Gregan, an animal control officer of the state, received a complaint from Laurie Buccieri, a

"(c) If it appears from the allegations of the petition and other affirmations of fact accompanying the petition, or provided subsequent thereto, that there is reasonable cause to find that the animal's condition or the circumstances surrounding its care require that its custody be immediately assumed to safeguard its welfare, the court shall either (1) issue an order to the owner or owners or person having responsibility for the care of the animal to show cause at such time as the court may designate why the court shall not vest in some suitable state, municipal or other public or private agency or person the animal's temporary care and custody pending a hearing on the petition or (2) issue an order vesting in some suitable state, municipal or other public or private agency or person the animal's temporary care and custody pending a hearing on the petition which hearing shall be held within ten days from the issuance of such order on the need for such temporary care and custody. The service of such orders may be made by any officer authorized by law to serve process, state police officer or indifferent person. . . .

"(e) (1) If, after hearing, the court finds that the animal is neglected or cruelly treated, it may vest ownership of the animal in any state, municipal or other public or private agency which is permitted by law to care for neglected or cruelly treated animals or with any person found to be suitable or worthy of such responsibility by the court. . . .

"(f) Unless the court finds that the animal is not neglected or cruelly treated, the expense incurred by the state or a municipality in providing proper food, shelter and care to an animal it has taken charge of under subsection (a) of this section and the expense incurred by any state, municipal or other public or private agency or person in providing temporary care and custody to an animal under subsection (c) of this section, calculated at the rate of fifteen dollars per day, shall be paid by the owner or owners or person having responsibility for the care of the animal. . . ."

All references to § 22-329a in this opinion are to the 2005 revision of the statute.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

volunteer for the Alliance for Animal Rescue Society[3] (society), that the defendant, who was the president of the society, was keeping numerous cats at her residence in Torrington that were neglected and sick. Buccieri also stated that the cats were unsanitary and flea-infested and that the defendant had admitted to her that she had found dead cats in her residence within the previous two years.

The next day, Gregan received a second complaint concerning the defendant from Karen Meares, another volunteer for the society. Meares stated that the defendant had asked her to provide a foster home for two kittens that the defendant could not keep because her residence was infested with fleas that could be fatal to the kittens. The kittens were ill when the defendant gave them to Meares, and Meares' veterinarian diagnosed them as having a respiratory infection. One of the kittens ultimately died.

Several days later, Gregan received a third complaint concerning the defendant from Melanie Mead, another volunteer for the society. Mead stated that the defendant had more than forty cats in her residence, many of which were sick and that the defendant could not afford medical treatment for them. Mead stated that a number of cats had died and that the defendant sometimes would not find them until days after their deaths.

On February 9, 2006, Gregan went to the defendant's residence accompanied by Barbara Godejohn, another animal control officer. The defendant refused to allow Gregan and Godejohn to enter her residence and denied that there were any sick cats inside. She also refused to provide Gregan with rabies certificates for the cats.

Several days later, the defendant asked Edward Dimmick, a veterinarian, to come to her home and vaccinate

---

[3] The Alliance for Animal Rescue Society is a nonprofit organization that provides shelter and adoption services for cats.

the cats for rabies. Dimmick was able to vaccinate twenty-nine cats before he ran out of vaccine. None of the cats were current in their vaccinations. He examined all of the cats in the defendant's residence except for seven cats that were too feral to handle.

Thereafter, Gregan obtained a search and seizure warrant and went to the defendant's residence to seize the cats. He was accompanied by Robert Rubbo, a member of the Torrington police department, and by a public health officer for Torrington and several animal control officers from around the state. A strong odor of ammonia, consistent with cat urine, could be detected from outside the residence. Upon entering the residence, the various state officers observed that the kitchen, living room, bedrooms and bathroom were cluttered with trash and garbage, leaving only narrow pathways for walking. The clutter reached the ceiling in certain rooms. The stacks of trash, including more than ten open bags of raw garbage, prevented the officers from opening the bathroom and bedroom doors more than a few inches.

The officers found forty-six cats in the 950 square foot residence and one dead cat in the freezer compartment of the refrigerator. They found several cat litter boxes, some filled with feces. Cat feces, vomit and urine were spread throughout the house, including on shelves, on and next to bottles of cat medicine and on and next to the cats' feeding dishes. There was moldy cat food in the microwave oven and in the refrigerator. Although there were sealed bags of cat food on the premises, there did not appear to be sufficient food available for all of the cats. The trial court expressly rejected the defendant's claim that the conditions in the house were "due to the fact that she had not been able to clean up as usual [on the morning of the search] and the tremendous amount of clutter was due to her collecting material for a tag sale." The court found that,

based on the volume and dried condition of the feces and urine, they had been there for some time, and that the clutter was trash and junk.

Gregan and the other officers seized the forty-six cats, put them in individual cages and transported them to the offices of Richard O'Grady, a veterinarian. O'Grady examined thirty-six of the cats. Thirty-two cats had ear mites; three had upper respiratory infections; one had a chronic upper respiratory infection; six had runny or crusty eyes; two had conjunctivitis; four had bad teeth; one had no teeth; one had fleas; one had tapeworms; two were thin; and one had scabby skin. O'Grady concluded that most of the cats required further medical treatment. O'Grady's professional opinion was that the cats would not be able to recover their health in the defendant's residence because of the conditions in the residence and the large number of cats.

After O'Grady examined the cats, they were transported to four animal shelters around the state. Thereafter, many of the cats were diagnosed as having Bartonella,[4] tapeworms, fleas and various other maladies. Two cats died within several weeks of their removal from the defendant's residence and two had to be euthanized. The trial court found that the cats had contracted these maladies while in the defendant's care.

After it seized the cats, the state brought this action pursuant to § 22-329a seeking orders: vesting temporary custody of the cats with the department pending a hearing pursuant to § 22-329a (b); requiring the defendant either to relinquish ownership of the cats to the department or to post a bond with the department in the amount of $450 per cat for the reasonable expenses in caring and providing for them; declaring that the

---

[4] O'Grady testified that Bartonella is a contagious disease spread by fleas and may cause gingivitis, stomatitis, oral ulcers, respiratory diseases, ocular diseases, conjunctivitis, diarrhea and vomiting.

defendant had neglected or cruelly treated the cats in violation of General Statutes § 53-247 (a);[5] vesting permanent ownership and custody of the cats with the department and allowing it to euthanize any injured or diseased cats, if necessary; and requiring the defendant, pursuant to § 22-329a (f), to pay the department $15 per cat per day for each day from the date that the cats were seized until the date that ownership vested in the department. After a trial, the court found by a preponderance of the evidence that the defendant had neglected the cats by depriving them of proper care, food and medical attention. In reaching that conclusion, the court relied on several dictionary definitions of the word "neglect."[6] The court found that the defendant

[5] General Statutes § 53-247 (a) provides: "Any person who overdrives, drives when overloaded, overworks, tortures, deprives of necessary sustenance, mutilates or cruelly beats or kills or unjustifiably injures any animal, or who, having impounded or confined any animal, fails to give such animal proper care or neglects to cage or restrain any such animal from doing injury to itself or to another animal or fails to supply any such animal with wholesome air, food and water, or unjustifiably administers any poisonous or noxious drug or substance to any domestic animal or unjustifiably exposes any such drug or substance, with intent that the same shall be taken by an animal, or causes it to be done, or, having charge or custody of any animal, inflicts cruelty upon it or fails to provide it with proper food, drink or protection from the weather or abandons it or carries it or causes it to be carried in a cruel manner, or fights with or baits, harasses or worries any animal for the purpose of making it perform for amusement, diversion or exhibition, shall be fined not more than one thousand dollars or imprisoned not more than one year or both."

[6] Specifically, the trial court noted that Black's Law Dictionary states that neglect "[m]ay mean to omit, fail, or forbear to do a thing that can be done, or that is required to be done, but it may also import an absence of care or attention in the doing or omission of a given act. And it may mean a designed refusal, indifference or unwillingness to perform one's duty." Black's Law Dictionary (6th Ed. 1990). The court also noted that "Webster's New World Dictionary defines neglect as '[to] ignore or disregard, to fail to care for or attend to sufficiently or properly, lack of sufficient or proper care.' Webster's New Universal Unabridged Dictionary defines neglect as '1. to pay no attention or too little attention to; disregard or slight; 2. to be remiss in the care or treatment of; 3. to omit, through indifference or carelessness; 4. to fail to carry out or perform (orders, duties, etc.).'"

had not treated the cats cruelly because she had no intent to inflict pain and suffering on them. The court awarded permanent custody of the cats to the department and ordered the defendant to reimburse the state for veterinarian bills in the amount of $6248.60 and to pay the state $15 per cat per day from the date that the cats were seized.

This appeal followed. The defendant claims that: (1) the trial court applied an improper standard in determining that she had neglected the cats; and (2) § 22-329a is unconstitutionally vague. We disagree with both claims.

## I

We first address the defendant's claim that the trial court applied an improper standard in determining that the defendant neglected the cats. The defendant contends that the trial court improperly relied on a broad definition of neglect when § 22-329a expressly provides that actions pursuant to that section may be predicated only on the violation of the specific statutes listed therein. She further contends that she did not violate the provisions of any of those statutes.

The meaning of neglect under § 22-329a is a question of statutory interpretation, over which our review is plenary. *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, 281 Conn. 66, 72, 912 A.2d 1008 (2007). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering

such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 405, 891 A.2d 959 (2006).

We begin our analysis with the relevant language of § 22-329a (a): "The Chief Animal Control Officer, any animal control officer or any municipal or regional animal control officer may lawfully take charge of any animal found neglected or cruelly treated, in violation of sections 22-366, 22-415 and 53-247 to 53-252, inclusive, and shall thereupon proceed as provided in subsection (b) of this section . . . ." It is clear from this language that § 22-329a does not contain an independent standard of neglect but, instead, incorporates by reference the standards of the specific statutes enumerated therein. As the defendant recognizes, § 53-247 is the only statute listed in § 22-329a that applies to her conduct. Accordingly, to determine what constitutes neglect under § 22-329a under the circumstances of this case, we must look to the language of § 53-247. Section 53-247 provides in relevant part: "(a) Any person who . . . deprives of necessary sustenance . . . any animal, or who, having impounded or confined any animal, fails to give such animal proper care or . . . fails to supply any such animal with wholesome air, food and water, or . . . having charge or custody of any animal . . . fails to provide it with proper food, drink or protection from the weather . . . shall be fined not more than

one thousand dollars or imprisoned not more than one year or both. . . ." It is reasonable to conclude, therefore, that the neglect referred to in § 22-329a includes the failure to provide necessary sustenance, proper care, wholesome air, food and water under § 53-247 (a).

The defendant contends, however, that, because only the portion of § 53-247 (a) pertaining to the caging or restraining of animals expressly criminalizes conduct involving neglect; see footnote 5 of this opinion; all of the other conduct prohibited by the statute necessarily involves intentional cruelty. She further contends that, because the trial court expressly found that her conduct had not been cruel, she could not have violated § 53-247 (a) and, therefore, there was no basis for the court's conclusion that she had violated § 22-329a. We are not persuaded. The plain language of § 53-247 (a) belies any claim that the legislature believed that all of the prohibited conduct, except for the "neglects to cage or restrain" portion, involves intentional cruelty. The relevant portions of the statute require proof only that the defendant *failed* to provide necessary sustenance, proper care, wholesome air, food and water to an animal that the defendant had confined or over which the defendant had custody.[7] We can perceive no significant difference between the words "neglect" and "fail" in this context. We conclude, therefore, that the relevant portions of § 53-247 (a) involve neglectful conduct and that a violation of them can provide the basis for a finding that an animal was neglected under § 22-329a.[8]

[7] The defendant makes no claim that she had not "impounded or confined" the cats or that she did not have "charge or custody" of them under § 53-247 (a). In her brief to this court, she states that the cats were indoor cats and she refers to them as her "beloved pets."

[8] At oral argument before this court, the defendant represented that she had been charged under § 53-247 (a) in connection with the conduct that is at issue in this case and that the criminal charges ultimately were dismissed. She makes no claim that the dismissal of those charges is somehow inconsistent with the judgment against her in this case, and we can perceive no reason that it would be.

In the present case, the trial court's conclusion that the defendant had neglected the cats under § 22-329a was premised on its finding that the cats "were deprived of proper care, deprived of proper food and proper medical attention. They were allowed to live in conditions that were injurious to their well-being." We have concluded that the failure to give proper care to a confined animal or to provide it with proper food constitutes neglectful conduct in violation of § 53-247 (a).[9] Accordingly, we conclude that the trial court applied the proper standard in determining that the defendant had neglected the cats under § 22-329a.

## II

We next address the defendant's claim that § 22-329a is unconstitutionally vague because it does not define neglect. We disagree.

As a preliminary matter, we address the state's contention that this claim was not preserved for appellate review. The defendant concedes that she did not raise the claim at trial, but she seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[10]

---

[9] We recognize that the trial court relied on various dictionary definitions of neglect in determining that the defendant had violated § 22-329a. As we have indicated, there was no need for the trial court to go beyond the provisions of § 53-247 (a) in making its determination. Any impropriety in relying on the dictionary definitions instead of § 53-247 (a) necessarily was harmless, however, because the dictionaries essentially defined neglect as the failure to take proper care; see footnote 6 of this opinion; and the court expressly found that the defendant had deprived the cats of proper care and proper food. Thus, the court applied the same standard that is set forth in § 53-247 (a). Cf. *State* v. *Brown*, 259 Conn. 799, 809, 792 A.2d 86 (2002) (failure to instruct jury on statutory definition of firearm was not reversible error when jury was presumed to apply dictionary definition that was substantially identical).

[10] Under *Golding*, a defendant can, on appeal, prevail on a constitutional claim of error when the claim was not raised in the trial court only if all of the following conditions are satisfied: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and

Because she cannot satisfy the third *Golding* condition that a constitutional violation clearly exists and clearly deprived her of a fair trial, we conclude that she cannot prevail. See *State* v. *Brown*, 279 Conn. 493, 504, 903 A.2d 169 (2006).

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. . . . A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [her], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [she] had inadequate notice of what was prohibited or that [she was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Citation omitted; internal quotation marks omitted.) *State* v. *Scruggs*, 279 Conn. 698, 709–10, 905 A.2d 24 (2006). Unless a vagueness claim implicates the first amendment right to free speech, "[a] defendant whose conduct clearly comes within a statute's unmistakable core of prohibited conduct may not challenge the statute because it is vague as

(4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

applied to some hypothetical situation . . . ." (Internal quotation marks omitted.) *State* v. *Ehlers*, 252 Conn. 579, 584, 750 A.2d 1079 (2000).

The defendant claims that § 22-329a is unconstitutionally vague because it fails to define neglect. We concluded in part I of this opinion, however, that § 22-329a incorporates by reference § 53-247, which sets forth specific types of conduct that constitute neglect. Accordingly, we conclude that § 22-329a is not unconstitutionally vague as applied.[11]

The defendant also claims, however, that the failure to provide "proper care" and "proper food," which specifically is prohibited by § 53-247 (a) and which provided the basis for the trial court's conclusion that the defendant had violated § 22-329a, is itself an "ever shifting" standard of neglect. We agree with the defendant that the phrases "proper care" and "proper food" as used in § 53-247 (a) are susceptible to a wide range of interpretations and could be vague as applied to some situations. Our careful review of the record in the present case, however, satisfies us that the defendant's conduct came within the "statute's unmistakable core of prohibited conduct . . . ." *State* v. *Ehlers*, supra, 252 Conn. 584. The trial court found that the defendant was keeping forty-six live cats and one dead cat in a 950 square foot residence, much of which was so cluttered with personal effects, trash and bags of raw garbage that it was unusable. The court also found, and the evidence amply demonstrated, that the residence was, and had been for some time, in a "deplorable, filthy, unsanitary [and] unhealthy" condition, with cat feces, vomit and urine present throughout. The odor of cat urine was so strong that it was detectable from outside.

---

[11] Indeed, the defendant concedes in her brief to this court that "[t]he neglect referred to in [§ 22-329a] is not a broad and malleable standard . . . rather, it is limited to 'neglect' as defined [in § 53-247 (a)]."

We conclude that a person of ordinary intelligence would know that confining forty-six cats in these unhealthy conditions constituted a failure to provide proper care for the cats under any reasonable standard. Moreover, none of the cats were current in their rabies vaccinations and many of them were diseased, clearly reflecting that they needed but had not received proper care. We conclude, therefore, that § 53-247 (a) is not vague as applied to the defendant's conduct through § 22-329a.

The judgment is affirmed.

In this opinion the other justices concurred.