******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* FREDERICK ACKER
(AC 36578)

Sheldon, Prescott and West, Js.

*Argued February 5—officially released October 27, 2015*

(Appeal from Superior Court, judicial district of Litchfield, geographical area number eighteen, Danaher, J.)

*Frederick B. Acker*, self-represented, with whom, on the brief, was *Ralph C. Crozier*, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom were *Meredith S. Blake*, special deputy assistant state's attorney, and, on the brief, *David S. Shepack*, state's attorney, and *Devin T. Stilson*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Frederick Acker, appeals from the judgment of conviction of fifteen counts of animal cruelty in violation of General Statutes § 53-247 (a).[1] On appeal, the defendant claims that (1) there was insufficient evidence to support the conviction and (2) § 53-247 (a) is unconstitutionally vague as applied to the facts of this case. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. In the fall of 2012, the defendant was the director of a private organization, Connecticut Pets Alive, Inc., also known as the Society for the Prevention of Cruelty to Animals of Connecticut, Inc., which maintained a nonprofit facility to house rescued dogs in Monroe. In October, 2012, the defendant, on behalf of Connecticut Pets Alive, Inc., rented a second, larger rescue facility in Bethlehem (Bethlehem facility).[2] The Bethlehem facility was a three section barn with garage doors, a concrete floor, and an open rafter roof. The defendant rented the right and center bays of the barn. His plan was for the dogs to be kept in the right, unfinished bay until the construction on the center bay was completed, after which the plan was to move the dogs to the center bay and complete the right section.

On October 10, 2012, a dog escaped from the Bethlehem facility. On October 11, 2012, Judy Umstead, a Bethlehem/Woodbury Animal Control Officer, received a complaint about a dog on Route 63 and found a dog dead on the side of the road. Umstead visited the Bethlehem facility and determined that the dog that had been struck by a car was the dog that had escaped.

On October 17, 2012, Umstead returned to the Bethlehem facility with Department of Agriculture Animal Control Officer Richard Gregan. The defendant was not present, but his employee allowed Umstead and Gregan to enter, tour, and photograph the Bethlehem facility, and to look at the dogs. They observed that the facility lacked insulated outer walls, hot water, and adequate interior lighting. They observed three small space heaters that produced inadequate heat in light of the size of the space and the lack of insulation.

After the visit, Gregan called the defendant to voice his concerns that cold weather was coming and that the Bethlehem facility was inadequately heated. Gregan advised the defendant that the space heaters were inadequate for the Bethlehem facility. In response to Gregan's concerns, the defendant explained that he knew the overnight temperatures were getting colder, and that he boarded the small dogs overnight with his veterinarian, David Basak-Smith, so that they could be warm.[3] The defendant stated that he was making plans to heat the building properly, and to address most, if not all, of the concerns Gregan voiced.

On November 8, 2012, at approximately 7:45 a.m., State Trooper Matthew Eagleston and Umstead arrived at the Bethlehem facility because they were concerned about the cold temperatures. The approximate high and low outdoor temperatures in Morris on November 6, 7, and 8, 2012, were 38 and 20 degrees, 33 and 27 degrees, and 35 and 31 degrees, respectively.[4] There was light to moderate snow on November 7, 2012, and the winds on November 8, 2012, ranged from a low of 10 miles per hour to a high of 27 miles per hour. An employee of the defendant arrived shortly after 7:45 a.m., and gave Eagleston and Umstead permission to enter the Bethlehem facility and look around. The conditions inside the Bethlehem facility were very cold and drafty, with two operating space heaters providing little heat. Many of the dogs were in travel size crates intended for short-term confinement, with no bedding other than some newspaper.

After leaving the Bethlehem facility, Eagleston prepared a search and seizure warrant to seize the dogs and have them evaluated by a veterinarian. At 3:30 p.m. that day, Eagleston and the search team entered the Bethlehem facility to execute the warrant. Eagleston observed that a thermometer near one of the space heaters indicated that the temperature was 36 degrees. Each dog was briefly evaluated by a veterinarian, Bradley Davis, photographed by the state police, and then removed from the Bethlehem facility by Davis and animal control officers.

On December 2, 2013, the state filed an amended long form information charging the defendant with sixty-three counts of animal cruelty in violation of § 53-247 (a). Each count identified a different dog and alleged that the defendant had confined and failed to give the animal "proper care by exposing him [or her] to conditions that placed him [or her] at risk of hypothermia, dehydration, or to conditions injurious to his [or her] well-being . . . ."

After a trial to the court, *Danaher, J.*, the defendant was convicted of fifteen counts[5] and acquitted of the remaining forty-eight counts of animal cruelty. In reaching its decision, the trial court relied on *State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 947 A.2d 282 (2008) (*Koczur*). In *Koczur*, the evidence showed that the defendant was keeping forty-six live cats and one dead cat in a 950 square foot home, much of which was so cluttered with personal effects and trash that it was unusable. Id., 157. In determining the meaning of neglect under General Statutes § 22-329a, the court looked to § 53-247, as § 22-329a incorporates by reference the standards set forth in § 53-247. Id., 153. The court concluded that the trial court had applied the proper standard in determining that the cats were neglected, because "the failure to give proper care to a confined animal or to provide it with proper food constitutes

neglectful conduct in violation of § 53-247 (a)." Id., 155.

In the present case, the trial court found: "[U]nlike the situation in *Koczur* where the cats at issue were within the defendant's residence and presumably had [some] freedom to move about, the dogs in this case spent most of their days, and up to sixteen hours overnight, confined in carriers. Many of the latter carriers were intended for transport and not long-term confinement. Further, the dogs were confined in a facility that was not sufficiently heated. In *Koczur* most of the animals required further medical treatment after they were seized; in this case most of the dogs that were seized did not require treatment for conditions related to their confinement. However, there were fifteen dogs that were in jeopardy on the date they were seized, due to the low temperature in the environment where the defendant had confined them. The latter fifteen dogs required transfer to a warm environment when they were seized."

The court further found: "Some of the dogs seized in this case were of a size and breed which made them particularly susceptible to cold temperatures. The defendant was on notice that the lack of heat in the facility was problematic; and although the defendant made some efforts to ameliorate the cold conditions in which the dogs were confined, those efforts were inadequate as to some of the dogs. The fact that the defendant was on notice that the facility was unheated, the fact that he made meager efforts to address the cold temperatures to which the dogs were exposed, the fact that he misled an animal control officer as to the manner in which he cared for smaller dogs at night, all coupled with the testimony regarding the conditions at the facility on the date of the seizure, combine to convince the court that the state established, beyond a reasonable doubt, that a person of ordinary intelligence would know that the manner in which certain small dogs were confined was not proper care."

The court concluded that the defendant had failed to give proper care to fifteen dogs "by exposing those dogs to conditions injurious to their well-being [by confining] those dogs in a facility that, in view of the nature of the confinement, provided inadequate heat for the size and breed of the . . . dogs." The court imposed a total effective sentence on all charges of six months incarceration, execution suspended, followed by two years probation. This appeal followed.

## I

The defendant's first claim is difficult to decipher. He titles his first claim: "The court applied an improper standard in finding the defendant guilty pursuant to [§] 53-247 (a) as to specific dogs having insufficient evidence of improper care to warrant the findings versus other dogs of same or similar breeds." At first

glance, it appears the defendant is arguing that the court applied an improper legal standard because he states "[t]he meaning of 'proper care' is a question of statutory interpretation over which review is plenary," and cites the standard used when interpreting a statute. The defendant, however, goes on to describe the evidence presented as to each of the dogs at issue and to argue how that evidence was insufficient to support the court's conclusion that the defendant had failed to provide proper care to that dog.[6] He argues that the only basis for each finding of guilt was the court's belief that on a certain day some of the dogs were cold and that he provided inadequate heat for the size and breed of such dogs. He contends that none of the dogs needed emergency medical treatment or follow-up treatment. We interpret the defendant's first claim as raising a sufficiency argument—namely, that the court improperly found that he had violated § 53-247 (a) because there was insufficient evidence that these particular fifteen dogs did not receive proper care. We reject the defendant's claim.

We begin by setting forth the standard of review that informs our analysis. "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the [decision]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support the [decision]. . . . Moreover, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 778, 99 A.3d 1130 (2014).

We also are mindful that "[q]uestions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Pettigrew*, 124 Conn. App. 9, 31, 3 A.3d 148, cert. denied, 299 Conn. 916, 10 A.3d 1052 (2010).

Section 53-247 (a) provides in relevant part: "Any person . . . who, having impounded or confined any animal, fails to give such animal proper care . . . or,

having charge or custody of any animal . . . fails to provide it with proper food, drink or protection from the weather . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both . . . ."

We conclude that the totality of the evidence was sufficient to allow the court to conclude beyond a reasonable doubt that the defendant did not provide proper care to the fifteen dogs. The defendant was warned that cold weather was coming and that the Bethlehem facility was inadequately heated. He was advised that the space heaters were inadequate, and he misled an animal control officer as to how he cared for the small dogs overnight. The trial court credited the testimony of Davis and Eagleston that on November 8, 2012, there were only two space heaters in the Bethlehem facility, the space heaters gave off very little heat, and the temperature inside the Bethlehem facility was as low as 36 degrees. The record before us also includes the testimony from multiple witnesses, including Davis and Gregan, that many of the dogs were in travel size crates intended for short-term confinement only, with no bedding other than some urine soaked newspaper that was pushed to the side in many of the crates. The fifteen dogs were cold and struggling to maintain their body temperatures, as evidenced by their violent shivering.[7] Additionally, the fifteen small dogs required transfer to a warmer environment when they were seized because they were cold and violently shivering. Construing the evidence in the light most favorable to sustaining the decision, we hold that the evidence was sufficient to support a finding beyond a reasonable doubt that the defendant confined and failed to provide proper care to the fifteen dogs in violation of § 53-247 (a).

## II

We next address the defendant's claim that § 53-247 (a) is void for vagueness, as applied to the facts of this case, when the court found him guilty, under the statute, for failure to render "proper care" to fifteen dogs in his charge or custody by the manner in which he had confined them—in small cages, without bedding, and at a low temperature, when the dogs were exhibiting signs of imminent hypothermia. The defendant argues that the statute prescribes no standards for the care and keeping of dogs, either in general terms or, more specifically, in relation to sheltering them from the cold. Without such statutory standards, claims the defendant, the statute fails to give adequate notice to persons governed by it to pass constitutional muster.

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited

so that he may act accordingly. . . . A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [him], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . Unless a vagueness claim implicates the first amendment right to free speech, [a] defendant whose conduct clearly comes within a statute's *unmistakable core of prohibited conduct* may not challenge the statute because it is vague as applied to some hypothetical situation . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 156–57.

As stated previously, § 53-247 (a) provides in relevant part: "Any person . . . who, having impounded or confined any animal, fails to give such animal proper care . . . or, having charge or custody of any animal . . . fails to provide it with proper food, drink or protection from the weather . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both . . . ."

Here, the question is whether the statute put the defendant on sufficient notice that the manner in which he cared for the dogs in his charge or custody was improper and, thus, violated the statute, by failing to provide them with proper protection from the cold. The manifest purpose of the statute is to ensure that no impounded or confined animal, including any dog, is exposed by its caretaker to conditions harmful to its health or well-being. Such harmful conditions can result from extremes in temperature, extreme dampness or dryness, or unsafe exposure to wind, hail, lightning, or other atmospheric phenomena that, alone or in combination, risk harming the animal's health or physical condition. See generally Regs., Conn. State Agencies § 22-336-13 et seq. (standards for construction and improvement of dog pounds including adequate heat, water, and shelter).

Section 53-247 (a) does not include a list of extreme conditions to which caretakers cannot lawfully expose animals of particular species or breeds without violating the statute. The inclusion of such a list in the statute would be impractical at best, as the statute is intended to protect all impounded or confined animals from

exposure to conditions that risk harming their health or physical condition, and the species and breeds for which such protection is sought are too numerous to codify. See *State* v. *DeFrancesco*, 235 Conn. 426, 443–44, 668 A.2d 348 (1995) ("It is not necessary . . . that a statute list the precise conduct prohibited or required. . . . It is recognized that the law may be general in nature; the constitution requires no more than a reasonableness of certainty." [Internal quotation marks omitted.]). The predictable effects, moreover, of exposure to extreme conditions are naturally quite variable, even among animals of particular species or breeds, making a species-by-species or breed-by-breed codification of the limits of permissible exposure to such conditions of doubtful utility.

What is—or ought to be—clear to any caretaker of an animal in his charge or custody, however, is when that animal exhibits physical or behavioral signs that it has begun to suffer adverse effects from its exposure to extreme conditions. When the animal displays visible signs of distress resulting from its exposure to extreme temperatures, the caretaker is placed on notice that the manner in which he is keeping the animal has placed the animal at risk of suffering illness or physical harm. Conduct by a caretaker, which places an animal in his charge or custody at such a risk of illness or physical harm that it begins to exhibit the visible signs of such illness or harm, clearly lies at the "statute's unmistakable core of prohibited conduct . . . ." (Internal quotation marks omitted.) *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 156.

In this case, although the fifteen dogs, whose exposure to extreme cold underlay the defendant's convictions, were of different breeds and sizes, they all shared the common characteristic that, when observed in the place where the defendant had confined them, all were exhibiting the initial signs of hypothermia. Each was severely shaking to supply itself with warmth not otherwise available to it from its bedding or the defendant's electronic heaters, thus, in the opinion of a veterinarian, requiring the animal's immediate removal to a warmer environment. The conduct that caused each of these dogs to be kept in such conditions, despite their visible, weather induced suffering, clearly lies at the unmistakable core of the conduct which any person of ordinary intelligence would know to be proscribed by the statute. On that basis, we conclude that § 53-247 (a) is not vague as applied to the facts of this case.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Section 53-247 (a) was amended by No. 12-86 of the 2012 Public Acts and No. 13-258, § 114, of the 2013 Public Acts to add an additional penalty for a subsequent offense. Those amendments are not at issue in this appeal, and all references are to the current statute.

[2] The lease agreement for the Bethlehem facility is signed by the owner of the facility and by the defendant, on behalf of Connecticut Pets Alive,

Inc. The address for the Bethlehem facility is listed as 310 Watertown Road, Morris, at the behest of the tax assessor.

[3] In its memorandum of decision, the trial court credited the testimony of Basak-Smith that the defendant had not kenneled dogs with him in the past three years.

[4] All of the temperatures listed in this opinion refer to Fahrenheit measurements.

[5] The fifteen dogs are identified in counts 8, 10, 13, 14, 15, 16, 18, 19, 20, 23, 29, 40, 49, 58, and 59, and depicted in state's exhibits 27, 29, 32, 33, 34, 36, 37, 38, 41, 47, 58, 67, 76, and 77. We note, for clarity, that state's exhibit 32 depicts two of the dogs. Specifically, the dogs identified in counts 13 and 14.

[6] We note here that in *Bethlehem* v. *Acker*, 153 Conn. App. 449, 452–53, 102 A.3d 107 (2014), cert. denied, 315 Conn. 908, 105 A.3d 235 (2015), the defendant raised the argument that a different trial court applied an improper legal standard in the civil matter involving the same facts and the same dogs. In *Bethlehem* v. *Acker*, supra, 452–53, the town of Bethlehem sought custody of the defendant's dogs on the ground that the defendant was neglecting them in violation of § 22-329a. The trial court found that the "smaller breed dogs" were neglected, within the meaning of §§ 22-329a and 53-247, because the defendant failed to provide the dogs with proper protection from the weather. Id., 461. On appeal, the defendant argued that the trial court had applied an improper standard in making that determination because the court improperly relied on a temperature standard that was not established by statute. Id., 460. This court concluded, "following an examination of the language of § 22-329a and its relationship to other statutes, that failure to provide dogs with adequate protection from the weather constitutes neglect." Id., 462. This court, citing our Supreme Court's decision in *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 145, stated that § 22-329a does not contain a definition or standard of neglect, but rather incorporates by reference specific statutes, and concluded that the neglect referred to in § 22-329a includes the failure to provide protection from the weather, as provided in § 53-247. Id., 462–63. This court found that, in concluding that interior temperatures of 30 degrees constituted neglect with respect to the smaller breed dogs, "[t]he [trial] court neither adopted nor applied an improper legal standard. The court did not legislate a new standard applicable to rescue facilities; rather, it determined only whether, on the facts of this case, the [defendant] provided proper protection." Id., 465.

[7] Davis testified to the following: "When an animal responds to temperature stress, in many ways they respond with their behavior . . . . A malamute or husky with a heavy coat . . . can go curl up in a snow bank and be perfectly fine, but a small Chihuahua with almost no hair, stuck in a small dark cage, has almost no behavioral way to respond to temperature and he therefore is in danger at the temperatures that I experienced in that building. Most of the small dogs that I picked up were quaking, shivering violently, not just out of nervousness; I know the difference. These animals were shaking because . . . with temperature stress [and] going into potential hypothermia, one of the first responses is shivering because the body can no longer maintain its core temperature just by behavior by curling up or . . . by finding bedding. At this point, the body starts shivering with muscle to produce body heat to keep the core temperature up. Now this is a problem when you're little and thin because you can only shiver for so long before you run out of energy, and at that point that's when secondary and tertiary problems with hypothermia evolve."