******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TOWN OF BETHLEHEM ET AL. *v.*
FREDERICK ACKER ET AL.
(35463)

Beach, Keller and Borden, Js.

*Argued February 11—officially released October 14, 2014*

(Appeal from Superior Court, judicial district of
Litchfield, Trombley, J.)

*Steven A. Colarossi*, for the appellant-cross appellee
(named defendant).

*Anthony F. DiPentima*, for the appellee-cross appel-

lant (named plaintiff).

*Opinion*

BEACH, J. These appeals arise from an action alleging animal neglect brought by the plaintiffs, the town of Bethlehem (town) and Judy E. Umstead, town animal control officer, against the defendants, Frederick Acker and Connecticut Pets Alive, Inc., also known as the Society for the Prevention of Cruelty to Animals of Connecticut (SPCA of Connecticut), a nonprofit dog rescue facility.[1] On November 8, 2012, the plaintiffs seized approximately sixty-five dogs from the defendants' facility pursuant to a search and seizure warrant that had been issued on facts showing that the dogs, which were being kept in an uninsulated barn with an average temperature of 30 degrees Fahrenheit, were neglected, in violation of General Statutes § 22-329a. After a hearing, the trial court concluded that the smaller breed dogs were neglected and transferred ownership of the smaller breed dogs to the town. The court also concluded that the larger breed dogs were not so neglected and ordered those dogs to be returned to the defendants. The court also ordered the parties to "identify and agree as to how many of the smaller breed dogs were removed by the plaintiff[s] and are currently in [the plaintiffs'] custody," and to cooperate to find appropriate homes for those dogs.[2] This appeal and cross appeal followed.

On appeal, Acker claims that: (1) the court erred in concluding that the smaller breed dogs were neglected because (a) the court relied on a temperature standard that does not legally exist, (b) the court's finding that the dogs were "kept in temperatures in or below the thirties" was clearly erroneous, (c) the court erred in concluding, as a matter of law, that "the doctrine of predictive neglect" can be used to satisfy the neglect requirement of § 22-329a, and (d) § 22-329a is unconstitutionally vague as applied to the facts of this case because it does not define neglect; (2) the court erred in refusing to admit three forms of rebuttal testimony offered by the defendant; and (3) the court erred in granting the town's request for injunctive relief. On cross appeal, the town claims that the court erred in (1) "making individual subjective determinations of neglect based upon whether the animals seized were 'small breed dogs' or 'those dogs not of the smaller breed'," and (2) concluding that the larger breed dogs were not neglected.

We conclude that (1) the court applied the correct legal standards and properly determined that the smaller breed dogs were neglected and that the larger breed dogs were not neglected; (2) § 22-329a is not unconstitutionally vague as applied to the facts of this case; (3) the court did not err in declining to admit the rebuttal testimony offered by the defendants; and (4) the court did not err in granting the plaintiffs' request for injunctive relief and properly transferred ownership

of the smaller breed dogs to the town. The court's order directing the parties to agree among themselves which of the dogs removed from the defendants' facility are smaller breed dogs, however, is vague. We therefore reverse the judgment of the court only with respect to its dispositional order and remand the case for further proceedings, consistent with this opinion, in order (1) to determine the precise number of dogs seized from the defendants, and (2) to identify those dogs currently in the plaintiffs' possession who were adversely affected by the cold temperatures and those who were not.

The following facts, as found by the court, and procedural history are relevant to our resolution of the issues before us. On or about October 1, 2012, Acker began operating a dog rescue facility in a leased barn in the town. The barn was part of Sugar Mountain Farm and was accessible via 310 Watertown Road in Morris.[3] The town provided Acker with a town kennel license for the facility, which provided that the barn may house up to eighty dogs.

On October 10, 2012, the owner of property located at 310 Watertown Road made a roaming dog complaint to the town animal control office after seeing a small white dog loose in the area. Umstead was assigned to investigate the complaint. When Umstead arrived at 310 Watertown Road, she observed a barn surrounded by outdoor pens containing seventy-six dogs of various sizes. Seventeen of the dogs were smaller in size and were shivering in the rain. Umstead noted that the temperature was 52 degrees Fahrenheit, according to her town issued phone. Umstead spoke with Susan Fernandez, one of the defendants' employees, who informed her that the barn was part of the defendants' animal rescue facility and that a dog had escaped. Before leaving the facility, Umstead handed Fernandez and another employee her business card and told them to call her if they found the missing dog.

On October 11, 2012, Umstead received a phone call from an employee of Sugar Mountain Farm. The employee stated that she had seen a small white dog on the side of Route 63, near the entrance to 310 Watertown Road. Umstead responded and found a small white dog on the side of Route 63. The dog, however, had died and appeared to have been hit by a car. Umstead transported the deceased dog to Watertown Animal Hospital, where it was checked for identification via an implanted microchip. The microchip identified the dog as belonging to the SPCA of Connecticut. Umstead then transported the deceased dog to 310 Watertown Road where she spoke with Acker, who identified himself as the director of the SPCA of Connecticut and identified the dog as having come from his facility. Umstead then issued Acker a roaming dog infraction for violating General Statutes § 22-364a.

On October 13, 2012, Umstead visited the defendants' dog rescue facility. Unable to enter the barn because no employees were present, Umstead sought to measure the interior temperature of the barn by standing outside the barn and pointing a laser temperature gun at a closed glass window. Umstead recorded a temperature of 28 degrees Fahrenheit. She then issued a written warning informing the defendants that "[p]ursuant to [Connecticut] General Statute[s] [§] 53-247 animal cruelty, you are hereby warned that you are in violation of said law for at least [seventy-five] dogs on the property. On Saturday [October 13, 2012] at 6:30 a.m., the temperature in the closed barn housing said dogs was 28 degrees [Fahrenheit], recorded by Raytek mini temp laser gun. This recording was done by animal control and state police. This constitutes failure to give animals proper care, and protect from the weather. You must provide heat for all of the dogs to a temperature of at least 55 degrees [Fahrenheit]."

On October 17, 2012, Umstead again visited the defendants' animal rescue facility. This time, Umstead was accompanied by Richard Gregan, an animal control officer with the state Department of Agriculture, and Sergeant Goncalves, a Connecticut State Police Officer. Umstead observed that seventy-one dogs were being housed in outdoor pens. Upon entering the barn, Umstead observed that there were no heat sources. Umstead spoke with one of the defendants' employees, who informed her that an additional forty-one dogs would be arriving that evening. Umstead reminded the employee that the town kennel license limited the total number of dogs allowed at the animal rescue facility to eighty dogs. She also informed the employee that she was concerned as to whether the heating in the barn was adequate to protect the dogs from cold temperatures. Later that day, Umstead received a voice mail from Acker in which he stated that every night the smaller breed dogs were taken to the Monroe Town & Country Veterinary Hospital where they were kenneled. Gregan later contacted the veterinarian at the hospital, David Basak-Smith, who informed him that the hospital was not kenneling dogs on the defendants' behalf.

At approximately 7:40 a.m. on November 8, 2012, Umstead and state police Trooper Matthew Eagleston arrived at the defendants' facility to check on the condition of the animals. Unable to enter the barn because no employees were present, Umstead proceeded to measure the interior temperature of the facility by standing outside the barn and pointing the laser temperature device at a closed barn window. There was testimony at trial that the laser temperature device reported a temperature of 30 degrees Fahrenheit, on average. Shortly after Umstead measured the temperature, Meghan Amarante, one of the defendants' employees, arrived at the facility. Umstead spoke to Amarante and

asked her to sign a consent to search form. After receiving permission to enter the barn, Umstead entered and observed sixty dogs in small crates. Umstead noticed "two small electric radiator type heaters" and that there was "no visible insulation" in the facility. Using the same laser temperature device, Umstead measured the interior temperature a second time, this time by standing inside the barn and pointing the laser temperature at various areas inside the barn. The evidence presented at trial indicated that the second temperature recording was approximately 30 degrees Fahrenheit.

At approximately 9 a.m., Umstead, concerned about the health of the dogs, applied for a search and seizure warrant. At approximately 12:30 p.m., the court, *Marano, J.*, granted the application, thereby permitting Umstead, pursuant to § 22-329a (b), to take physical custody of all domestic animals found at 310 Watertown Road. The warrant and subsequent seizure were based on allegations that the animals were "neglected or found cruelly treated in violation of § 53-247" because they were being kept in an uninsulated shelter with an interior temperature of approximately 30 degrees Fahrenheit.

At approximately 3 p.m., Umstead, Eagleston, Gregan, Goncalves, and veterinarian William Bradley Davis, arrived at the defendants' facility to execute the warrant. When they arrived, Umstead noted that there was no food or water in the crates containing the dogs, and that "[s]ome [of the crates] had a lot of feces in them and it was cold." She also noted, and photographed, a small dog who was visibly shaking in the cold temperature. Believing that the animals were neglected, the plaintiffs seized "approximately sixty-five dogs" from the defendants' facility.[4] Four of the dogs needed immediate medical care and were taken to a veterinarian. The remaining dogs were taken to various animal control facilities throughout Connecticut. Several dogs who did not receive immediate veterinary care later received treatment for fleas and tapeworms.

On November 9, 2012, the plaintiffs filed an application for an order to show cause and an application for a temporary injunction, in which the plaintiffs sought a temporary injunction prohibiting Acker from owning, possessing, or controlling any animal.[5] The plaintiffs also filed a verified petition, pursuant to § 22-329a (c). In the petition, the plaintiffs alleged that the recorded temperature of approximately 32 degrees Fahrenheit constituted neglect in violation of § 53-247 and asserted the statutory right, pursuant to § 22-329a (b), to "take physical custody of any animal upon issuance of a warrant finding probable cause that such animal is neglected or is cruelly treated in violation" of § 53-247. The petition sought, inter alia, a court order vesting the town with temporary and permanent custody of the seized dogs, as well as an order prohibiting Acker from

owning any of those animals. The court issued an order to show cause, commanding the defendants to appear before the court on November 19, 2012.

Beginning on November 19, 2012, the parties engaged in a six day trial before the court, *Trombley, J.*, on the plaintiffs' application and the court's order to show cause. On February 14, 2013, the court issued its findings of fact and conclusions of law orally from the bench. The court concluded that (1) the plaintiffs had proven, by a fair preponderance of the evidence, that on November 8, 2012, the "smaller breed dogs" were neglected, and the court thus transferred ownership of the smaller breed dogs to the town; and (2) the plaintiffs had failed to prove, by a preponderance of the evidence, that the "larger breed dogs" were neglected and thus ordered that those dogs be returned to the defendants. The court required the parties to meet in order to reach an agreement regarding the exact number of dogs seized and the number and identities of the smaller breed dogs. The court also ordered the defendants to reimburse the town for food, shelter, and care of the smaller dogs at the statutory sum of $15 per day per dog; see General Statutes § 22-329a (h); for the period November 8, 2012, to February 14, 2013, in addition to paying for veterinary bills for treatment provided to the smaller dogs during that time period. This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

ACKER'S APPEAL—NEGLECT OF SMALLER BREED DOGS

Acker argues that the court erred in determining that the smaller breed dogs were neglected pursuant to § 22-329a. Specifically, he contends that (1) the court improperly relied on a temperature standard that does not legally exist; (2) the court's finding that the dogs were "kept in temperatures in or below the thirties" was clearly erroneous; (3) the court erred in applying the doctrine of predictive neglect; and (4) § 22-329a is unconstitutionally vague as applied to the facts of this case.

A

Acker contends that the court's conclusion that the smaller dogs were neglected resulted from the court's use of a 55 degree Fahrenheit minimum temperature standard. He argues that the use of this temperature standard was incorrect, as a matter of law, because neither the animal seizure statute, § 22-329a, nor the specifically referenced penal statute, § 53-247, establish a specific minimum temperature standard applicable to nonprofit animal rescue facilities. He further argues that the temperature standard employed by the court was inappropriate because § 22-336-19 of the Regulations of Connecticut State Agencies, which requires a 55 degree Fahrenheit temperature standard, applies

only to municipal dog pounds; there was no evidence presented that the defendants' facility was, at any time relevant to these proceedings, a dog pound as defined by the regulations.[6] Acker also argues that the plaintiffs' reference to § 22-344-7 of the Regulations of Connecticut State Agencies, which applies to commercial kennels, was irrelevant because it does not set, as Umstead claimed at trial, a 55 degree temperature standard, but rather only a "reasonable" temperature standard. We are not persuaded. We conclude that the court properly concluded that the smaller dogs were neglected and that this conclusion was not based on an erroneous statement or application of the law regarding animal neglect.

The following additional facts are relevant to our resolution of Acker's claim. In its oral decision, the court stated that on the basis of the evidence and testimony presented: "[T]he court finds that as to the small dogs, or the smaller breed dogs, the [town] has proven by a fair preponderance of the evidence that they were neglected within the meaning of §§ 22-329a and 53-247, as interpreted by our Supreme Court in [*State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 947 A.2d 282 (2008)] and in light of the doctrine of predictive neglect." The court's conclusion that the smaller dogs were neglected was therefore based on two independent legal grounds: (1) §§ 22-329a and 53-247, as interpreted by our Supreme Court in *Koczur*, and (2) the doctrine of predictive neglect.[7]

We first address the standard of review applicable to Acker's claim. On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. The meaning of neglect as used in § 22-329a is a question of statutory interpretation, over which our review is plenary. See, e.g., id., 152. "The application of a statute to a particular set of facts is a question of law." (Internal quotation marks omitted.) *In re Cameron C.*, 103 Conn. App. 746, 750–51, 930 A.2d 826 (2007), cert. denied, 285 Conn. 906, 942 A.2d 414 (2008). We therefore review Acker's definitional claim under the plenary standard of review.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . ." (Internal quotation marks omitted.) *Wasko* v. *Manella*, 269 Conn. 527, 534–35, 849 A.2d 777 (2004). In seeking to determine that meaning, we first consider "the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and

unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 152–53. In the present case, we conclude, following an examination of the language of § 22-329a and its relationship to other statutes, that failure to provide dogs with adequate protection from the weather constitutes neglect.

Section 22-329a (b) provides in relevant part that "any animal control officer . . . may take physical custody of any animal upon issuance of a warrant finding probable cause that such animal is neglected or cruelly treated in violation of section 22-236, 22-415, 53-247, 53-248, 53-249, 53-249a, 53-250, 53-251 or 53-252 . . . ."

Section 22-329a (b) does not contain an independent definition or standard of neglect. Instead, as the court correctly noted, § 22-329a incorporates by reference the standards of the specific statutes enumerated therein. *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 153. The court correctly recognized, and the parties agreed, that § 53-247 is the only relevant statute listed in § 22-329a that applies to the defendants' conduct. Accordingly, to determine what constitutes neglect under § 22-329a under the factual circumstances of this case, we look to the language of § 53-247. Section 53-247 (a) provides in relevant part: "Any person who . . . deprives of necessary sustenance . . . any animal, or who, having impounded or confined any animal, fails to give such animal proper care or . . . fails to supply any such animal with wholesome air, food and water, or . . . having charge or custody of any animal . . . fails to provide it with *proper* food, drink or *protection from the weather* . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both . . . ." (Emphasis added.) It is reasonable to conclude that the neglect referred to in § 22-329a includes the failure to provide necessary protection from the weather.

Section 53-247 does not define or provide standards for what constitutes "proper . . . protection from the weather . . . ." General Statutes § 53-247 (a). Moreover, there is no provision in the statutory scheme that contains such a definition. We therefore turn for guidance, as directed by case law, to related provisions that provide guidance for determining what is "proper . . . protection from the weather . . . ." General Statutes § 53-247 (a).

We turn, then, to the Regulations of Connecticut State Agencies. At trial, the parties and the court, correctly recognized that there is a gap in our regulatory scheme; although there are regulations that further define stan-

dards for "proper . . . protection from the weather" applicable to commercial kennels, municipal and town dog pounds, and pet stores, there are no such regulations that specifically pertain to nonprofit animal rescue shelters. Although these regulations perhaps do not precisely fit, by direct definition, the scenario before us, they are nevertheless instructive.[8] Additionally, we note that the court properly took judicial notice of these regulations, as both parties had notice and copies of the regulations, and neither party objected.

Section 22-344-7 of the Regulations of Connecticut State Agencies, effective January 6, 1970, applies to commercial kennels and provides that "[t]he kennel temperature shall be maintained at a *reasonable* and suitable level to promote the health and comfort of the type of dog or dogs housed." (Emphasis added.) Section 23-344-18a (a), effective April 26, 1989, applies to pet shops and provides that "[p]et shops shall be sufficiently heated to protect animals from the cold and to provide for their health and comfort at all times. The temperature of the air surrounding animals shall be maintained, under normal conditions, at a *minimum of 65* [degrees Fahrenheit] *and a maximum of 78* [degrees Fahrenheit], except for those animals which require higher temperatures. Animals shall be provided protection from the direct rays of the sun." (Emphasis added.) Section 22-336-19 (a), effective April 26, 1993, applies to "dog pounds"[9] and provides that "[t]hermostatically controlled clean and sanitary heat shall be provided to maintain a *minimum temperature of fifty-five (55)* degrees Fahrenheit at floor level. At no time shall the indoor temperature of the dog pound where dogs are housed exceed ninety (90) degrees Fahrenheit." (Emphasis added.)

Those regulations provide context for the court's conclusion that interior temperatures of 30 degrees Fahrenheit—far lower than analogous standards for other types of dog facilities—constituted neglect with respect to the smaller breed dogs. The court neither adopted nor applied an improper legal standard. The court did not legislate a new standard applicable to rescue facilities; rather, it determined only whether, on the facts of this case, the defendants provided proper protection.

The court's conclusion is factually supported as well by ample evidence in the record. First, the evidence submitted at trial supports the court's finding that the interior temperature of the barn on November 8, 2012, was approximately 30 degrees Fahrenheit. See part I B of this opinion. Second, the record before us includes testimony from veterinarians and animal control officers that establishes that interior temperatures of 30 degrees Fahrenheit are not adequate for smaller breed dogs, especially given that many of the dogs in the defendants' care came from warmer climates such as California and South Carolina. Third, there was testi-

mony from Umstead, Davis and Gregan that on November 8, 2012, they witnessed some of the smaller breed dogs shivering in the cold and exhibiting visible signs of stress.[10] Therefore, on the basis of the record before us, we conclude that the court properly determined that the smaller dogs were neglected.

B

Acker appears to argue that the court's finding that the dogs were "kept in temperatures in or below the thirties" was clearly erroneous because (1) "the only measurement of temperature was not reliable,"[11] and (2) some of the defendants' employees testified at trial that the interior temperature was not intolerable due to the presence of indoor heaters. We disagree.

"[A]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings of fact are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Kelsey M.*, 120 Conn. App. 537, 543, 992 A.2d 372 (2010). With those principles in mind, we will review the evidence presented at trial in order to determine whether the court's determination is supported by the evidence in the record.

Extensive evidence was presented at trial regarding the interior temperature of the facility on the morning of November 8, 2012. Umstead testified that she recorded an interior temperature of 32 degrees Fahrenheit—measured by using a laser temperature device while standing in the interior of the facility. Davis, a veterinarian, who was present at the time of the seizure, testified that the temperature inside the facility was 30 degrees Fahrenheit and that some of the areas were lower in temperature.[12]

In addition to evidence regarding the interior temperature of the facility, substantial evidence regarding the heating infrastructure in place at the facility was presented at trial. It was undisputed that there was no insulation in the facility and that the only source of heat was two or three small space heaters. Acker testified that the facility was a work in progress and that insulation, lighting, and an industrial heater had not yet been installed as of November 8, 2012. These improvements, however, according to Acker, had been completed as of January 17, 2013.

There was also testimony from Basak-Smith, the defendants' veterinarian, that Acker's statement to

Umstead that the smaller dogs were taken to Monroe Town & County Veterinary Hospital each night to protect them from the cold was untrue. On the basis of the evidence presented at trial, we conclude that the court's finding that the interior temperature was 30 degrees Fahrenheit was not clearly erroneous.

Acker points to testimony from two employees, Fernandez and Amarante, who testified that the temperature inside the facility was comfortable. Amarante testified that she was present at the facility on the morning of November 8, 2012, and was washing all of the dogs' food and water bowls. She testified that she was able to work comfortably wearing a thermal shirt and a sweatshirt, without a winter coat. Acker argues that if "the temperature in the [facility] was below freezing, the ability of . . . Amarante to wash bowls would have been impossible as water pipes would have frozen . . . ." Fernandez testified that she believed the temperature in the facility was approximately 50 to 55 degrees Fahrenheit.[13]

We do not determine the credibility of witnesses. See, e.g., *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 272, 89 A.3d 373 (2014) ("[w]e cannot retry the facts or pass on the credibility of the witnesses" [internal quotation marks omitted]). We are satisfied that the court's finding was supported by evidence in the record.

C

Acker argues that the court erred in concluding, as a matter of law, that "the doctrine of predictive neglect"[14] can be used to satisfy the neglect requirement in the animal seizure statute, § 22-329a. He also argues, alternatively, that even if the court correctly concluded that the doctrine of predictive neglect can be used to satisfy the neglect requirement, the court applied an improper legal standard—that is, the court should have applied a standard of proof greater than preponderance of the evidence.[15] The town argues that the court properly utilized the doctrine of predictive neglect in reaching its conclusions of law and maintains that the court was correct in applying the preponderance of the evidence standard.

In its oral decision, the court stated: "[A]s to the small dogs, or the smaller breed dogs, the [town] has proven by a fair preponderance of the evidence that they were neglected within the meaning of §§ 22-329a and 53-247, as interpreted by our Supreme Court in *Koczur* and in light of the doctrine of predictive neglect."

The court based its conclusion that the smaller breed dogs were neglected on two independent grounds: (1) as a result of their exposure to interior temperatures averaging 30 degrees Fahrenheit, the smaller dogs were "in danger of imminent harm and were, therefore, neglected" pursuant to § 22-329a and § 53-247 (a); and (2) the doctrine of predictive neglect. Because we con-

clude that the court properly based its finding of neglect on the standards set forth in §§ 22-329a and 53-247 and *Koczur*, we need not determine the validity of the court's second finding grounded in the doctrine of predictive neglect.

## D

Acker claims that "the 'neglect' standard as applied to the [present] case is impermissibly vague and thus constitutes a deprivation of [his] due process rights." He argues that he did not have fair notice of the law due to "the absence of a statutory definition of what constitutes a suitable temperature for a rescue shelter . . . ." (Citation omitted.) We disagree.

As a preliminary matter, we address the town's assertion that this claim is not reviewable because it was not properly preserved for appellate review and that Acker has not satisfied the requirements for appellate review set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Acker did not raise the claim at trial and did not request review of this claim on appeal pursuant to *Golding*, but nevertheless seeks review of his claim.[16]

A defendant, on appeal, "can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) Id.

Because Acker does not satisfy the third prong of *Golding*—that a constitutional violation clearly exists and clearly deprived him of fair trial—we conclude that he cannot prevail on this claim.

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. . . . A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [him], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for

vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Internal quotation marks omitted.) *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 156.

We interpret Acker's claim to be that § 22-329a is unconstitutionally vague as applied to the facts of this case because the failure to provide "protection from the weather," which is specifically prohibited by § 53-247 (a) and which provided the basis for the trial court's conclusion that he was subject to § 22-329a, constitutes an elusive standard of neglect, and that neither § 22-329a nor § 53-247 "provide for any temperature standards for rescue shelters" such as the defendants' facility.

We agree with Acker that the phrase "proper . . . protection from the weather" as used in § 53-247 (a) may be susceptible to some degree of interpretation. Our careful review of the record in the present case, however, satisfies us that the defendants' conduct came within the "statute's unmistakable core of prohibited conduct . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Ehlers*, 252 Conn. 579, 584, 750 A.2d 1079 (2000). The court found that on November 8, 2012, the defendants kept approximately sixty-five dogs in small crates in an uninsulated barn. The barn was heated by only two small space heaters. The court found that the evidence demonstrated that the interior temperature of the barn was approximately 30 degrees Fahrenheit. The court found that the smaller dogs were shivering due to the cold temperatures. The court also found that the evidence amply demonstrated that the smaller breed dogs and larger breed dogs would cope differently with cold temperatures. We conclude that a person of ordinary intelligence would know that keeping smaller breed dogs in an uninsulated space with an interior temperature of approximately 30 degrees Fahrenheit constitutes failure to provide proper protection from the weather. We conclude, therefore, that § 53-247 (a) is not vague as applied to the facts of this case by § 22-329a. See *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 157.

## II

### ACKER'S APPEAL—REBUTTAL EVIDENCE

Acker next claims that the court erred in not allowing certain testimony to be admitted in rebuttal regarding (1) the "applicable standards of care for dogs in rescue facilities"; (2) "care of a select group of the seized animals, which had been relocated to a municipal dog

pound in which they were observed outside on a very cold evening"; and (3) "the use of space heaters in another rescue shelter."

We first set forth the standard of review governing Acker's evidentiary claims. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless." (Citation omitted; internal quotation marks omitted.) *Dinan* v. *Marchand*, 279 Conn. 558, 567, 903 A.2d 201 (2006).

A

Acker claims that the court abused its discretion and that he was deprived of his constitutional right to due process when the court did not permit him to introduce, as rebuttal evidence, the testimony of Jimmy Gonzalez, chief animal control officer for Bridgeport, regarding a "standard of care for animal rescue facilities." We disagree.

The following additional facts are relevant to our resolution of Acker's claim. On November 19 and 20, 2012, the plaintiffs called Umstead as a witness. Umstead testified that her main concern regarding the animals was that they were being kept in 30 degree Fahrenheit temperatures. When asked about the basis of her opinion that the dogs were neglected, Umstead referenced §§ 22-336-13 to 22-336-30 of the Regulations of Connecticut State Agencies. The defendants' attorney conducted a cross-examination of Umstead, in which she asked Umstead to explain further the factors that led her to conclude that the dogs were neglected. On cross-examination, Umstead testified that, although the regulations referenced did not apply specifically to rescue facilities, such as the defendants' facility, they did provide temperature guidelines Acker should keep in mind in running his animal rescue operation.

On December 12, 2012, after Gonzalez was sworn in as a witness for the defendants, the following colloquy occurred:

"[The Defendants' Counsel]: . . . [W]hat kind of training have you had to become an animal control officer?

"[Gonzalez]: Um, myself, I've taken many different

online courses, I am a humane education instructor for the Police Officers Standards and Training Counsel. I am also a certified pet first aid and CPR trainer for the Red Cross.

"[The Defendants' Counsel]: Thank you. And were you present when Ms. Umstead was testifying about her certifications?

"[Gonzalez]: Yes, I was. . . .

"The Court: Counsel, was he present at the time that the dogs were seized by way of a warrant?

"[The Defendants' Counsel]: He was not present that day, Your Honor. No.

"The Court: Are any of the dogs in the Bridgeport facility under his control?

"[The Defendants' Counsel]: No, Your Honor.

"The Court: What is the purpose of his testimony?

"[The Defendants' Counsel]: The purpose of his testimony Your Honor, is that he is an animal control officer with credentials and experience necessary to refute the testimony of Ms. Umstead as to the standard of care that is routinely provided, not only by animal control, but also by those who house large quantities of animals.

"The Court: The standard of care was established through the [town's] perspective by the doctor who testified; that's the standard of care that the court's going to accept in light of the testimony from both sides as to what was at that facility. This gentleman wasn't at the facility; this gentleman doesn't have any control over any of the animals that were taken; I don't see any relevance . . . to anything he's going to tell me . . . .

"[The Defendants' Counsel]: Your Honor . . . I don't believe it is fair to [Acker] for this court to make a finding that the [town's] expert veterinarian is the only one who can establish a standard of care when a veterinarian's standard of care may be quite different than the standard of care commonly adopted by those who house large numbers of animals on a temporary basis. And I wanted it noted on the record that those are completely separate standard[s] of care similar to the standard of care provided by, for example, a personal physician versus a free clinic, a similar analysis. [Acker] has had zero opportunity to present any expert witness as to our position of the standard of care, and that is the purpose of this witness.

"The Court: Well, do you plan to present the veterinarian? I understand that you have a veterinarian that's going to testify.

"[The Defendants' Counsel]: I do have a veterinarian.

"The Court: Then your veterinarian can tell me about the standard of care for dogs, large and small, that was testified to by the [town's] veterinarian, and I could

then make a determination as to which expert testimony I believe with regard to the standard of care. . . . And by the way, the standard of care is set forth in the statute and by the Supreme Court decision that I pointed out this morning. That's the standard of care that the court's going to follow.

"[The Defendants' Counsel]: So, to be very clear, Your Honor is stating that the only person you will listen to regarding standard of care is a veterinarian?

"The Court: And my interpretation of the statute and the case . . . that I referred to this morning.

"[The Defendants' Counsel]: But Your Honor allowed Ms. Umstead to testify about the standard of care. She's an animal control officer, and she was allowed to testify about the standard of care. I believe I have a right to refute her testimony [with testimony] from another animal control officer.

"The Court: All right. Attorney [for the plaintiffs], let me ask you a question. Are you going to, in rebuttal, produce another animal control officer to contradict what you anticipate [Gonzalez is] going to say?

"[The Plaintiffs' Counsel]: Your Honor, if we're going to go down this ridiculous—

"The Court: That's exactly what you're going to do, isn't it?

"[The Plaintiffs' Counsel]: —course of action I will produce all 163 animal control officers in . . . Connecticut.

"The Court: Yeah, well, we're not going there."

Our law provides trial courts "wide discretion in admitting rebuttal testimony and in determining relevancy. . . . A plaintiff's rebuttal testimony is ordinarily limited to such purposes as refuting the defendant's evidence and impeaching or rehabilitating witnesses." (Citations omitted.) *Beinhorn* v. *Saraceno*, 23 Conn. App. 487, 493, 582 A.2d 208 (1990), cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991). "In considering whether a trial court has abused its discretion, appellate courts view such a trial court ruling by making every reasonable presumption in favor of the decision of the trial court." (Internal quotation marks omitted.) *Hackling* v. *Casbro Construction of Rhode Island*, 67 Conn. App. 286, 291–92, 786 A.2d 1214 (2001).

Acker contends that Umstead articulated a standard of care that did not apply to the defendants because the 55 degree Fahrenheit minimum temperature requirement she referred to in her testimony applies only to dog pounds, which the regulations define as an entity managed or controlled by a city or municipality. Acker contends that the defendants should have been able to introduce the testimony of Gonzalez regarding the applicable standard of care for animal rescue opera-

tions in order to rebut the testimony of Umstead, and that the court's exclusion constituted an abuse of discretion. The town contends that the court did not abuse its discretion because Gonzalez was not present at the facility at the time the animals were seized. The town also argues that the defendants were not deprived of the opportunity to offer rebuttal evidence regarding the standard of care at animal rescue facilities because the court allowed them to offer the testimony of Basak-Smith on the issue of the standard of care for animal rescue facilities.

The court articulated several reasons for not allowing the testimony of Gonzalez: (1) the "standard of care" the court would apply—"proper . . . protection from the weather"—was to be found in the statutes, that is, §§ 22-329a and 53-247 (a);[17] (2) the court would permit the defendants to introduce the testimony of Basak-Smith, a veterinarian; and (3) the proposed line of questioning would result in protracting the proceedings substantially.

The court did not abuse its discretion in excluding Gonzalez' testimony. First, the court articulated several times throughout the trial of the case that the "standard of care" was statutory. Second, the defendants had the opportunity to cross-examine Umstead. Third, the court did not deny the defendants the ability to present any evidence rebutting Umstead's testimony; it permitted the defendants to introduce the testimony of Basak-Smith on issues including exposure to light, food and water intake, and temperature. On the basis of the record before us, Acker has not shown that the court's exclusion of Gonzalez' testimony was a clear abuse of discretion, as the court balanced relevance against the consumption of time, appropriately considering judicial economy.

B

Acker next claims that the court abused its discretion in ruling inadmissible proffered testimony of Jeremy Evan Green, a professional investigator, who observed some of the dogs that were seized from the defendants' facility and were then being held at the Easton dog pound. We disagree.

The following additional facts are relevant to our resolution of this issue. On January 18, 2013, the defendants offered Green as a fact witness. The defendants' attorney proffered that Green would provide testimony regarding his personal observations of the seized dogs that were being held at the Easton dog pound. The defendants' attorney made the following offer of proof:

"[The Defendants' Counsel]: As an offer of proof, Your Honor, the witness has traveled to the Easton facility, in which some of [the defendants'] dogs are currently being housed, and has personally observed conditions exactly the same as those conditions the

[town] is claiming are neglectful in [its] position.

"The Court: Yes, but Easton isn't involved in this case in terms of any claim of neglect.

"[The Defendants' Counsel]: Okay. So, that was—

"The Court: Only the defendant is. So, it would be totally irrelevant to—

"[The Defendants' Counsel]: Your Honor, also—

"The Court: —anything I have to decide.

"[The Defendants' Counsel]: Well, just one final argument for the record—

"The Court: Okay. Yes.

"[The Defendants' Counsel]: —that Your Honor has to make a decision as to, ultimately, will title of these animals vest with [the defendants] or will it vest with [the plaintiffs]? So, to that, I think the conditions that [the plaintiffs are] currently in control of and overseeing and causing these dogs to be housed in would be relevant.

"The Court: Well, first of all, the disposition is very simple . . . . *The statute requires a finding of neglect as a prerequisite to vesting ownership of the animal in the state. Under § 22-329a, an animal is either neglected*, and the reference is to [§ 22-329a] (g) (1), *or not neglected*, and the reference is to [§ 22-329a] (g) (3), *regardless of who has ownership or custody of the animal. The purpose of the statute is to protect animals*, and not to impose criminal penalties on their owners.

"So, if under [§ 22-329a] (g) (1), if the court finds neglect, the court is obligated to vest ownership of the animals in the town of Bethlehem, and under [§ 22-329a] (g) (3), if the court does not find neglect, the court would be obligated, as I mentioned to counsel, to vest ownership in [Acker], but the court would have to be satisfied as to where the dogs would be so that we wouldn't start this all over again. But, I mean, that's the standard I have to follow; either they were neglected or they weren't. And if they weren't, you'd definitely— then [Acker] definitely would be the custodian of the animals subject to the issue of the [certificate of occupancy] and other issues that might affect it, such as the criminal case that we mentioned yesterday.

"So, I don't see what this witness could add to anything that I have to decide, either from the point of view of finding neglect or the point of view of the disposition.

"[The Defendants' Counsel]: Understood, Your Honor. . . .

"The Court: All right. Any other offer of proof with regard to this witness?

"[The Defendants' Counsel]: No, Your Honor."

(Emphasis in original.)

Section 4-2 of the Connecticut Code of Evidence provides in relevant part: "All relevant evidence is admissible, except as otherwise provided by the constitution of the United States, the constitution of this state, the Code or the General Statutes. Evidence that is not relevant is inadmissible." "Relevant evidence" means "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1.

Acker argues that "if there were eyewitness testimony that dogs seized from the defendants (on account of allegedly low temperatures in Bethlehem) had been left outside to brave the elements during a cold night, that would be relevant . . . ." We disagree.

We agree with the court that testimony regarding conditions at a different facility was irrelevant to the issue before the court, that is, whether the defendants had neglected the dogs as of November 8, 2012. The court therefore was tasked with reviewing the conditions that the dogs were kept in at the defendants' facility on November 8, 2012, and deciding whether the dogs' exposure to those conditions constituted neglect. The practices and conditions at other facilities were not material to the issue of whether the dogs were neglected *at the defendants'* dog rescue facility on November 8, 2012. We therefore conclude that the court did not abuse its discretion in ruling inadmissible Green's proffered testimony.

C

Acker claims that the court abused its discretion in sustaining the plaintiffs' objection to the defendants' attorney's proposed line of questioning of Gregan, a state animal control officer, regarding the use of space heaters at Last Post, an animal rescue shelter of which he was a member of the board of directors. We disagree.

The following additional facts are relevant to our resolution of Acker's claim. On November 21, 2012, the plaintiffs conducted a direct examination of Gregan. Gregan testified that he visited the barn housing the defendants' dog rescue facility for the first time on October 17, 2012, at which time he observed that the only heat source was two small, oil filled space heaters. Gregan testified that these space heaters were an inadequate source of heat, given the size of the barn and that fact that the barn was not insulated. On January 18, 2013, the defendants called Gregan as a witness. The defendants' attorney sought to question him regarding the use of space heaters at Last Post. The defendants' attorney made an offer of proof and the following colloquy occurred:

"The Court: I'm going to ask for an offer of proof.

"[The Defendants' Counsel]: Offer of proof, Your Honor. This gentleman testified at this trial that those space heaters are not appropriate, yet this gentleman's company that he's affiliated with used the exact same space heaters, had a fire, and twenty animals died. I think that's very relevant to impeach the witness.

"[The Plaintiffs' Counsel]: Your Honor, I can't—my disappointment with this line of questioning—

"The Court: I can't believe where you're going with this, counsel. What you're basically telling me is that an animal control officer who, basically, says he didn't think the space heaters were adequate has similar space heaters that malfunctioned in some way and animals died as a result?

"[The Defendants' Counsel]: Yes.

"The Court: What does that have to do with his credibility?

"[The Defendants' Counsel]: Well, it impeaches his testimony that he thinks they're inappropriate because—

"The Court: I don't know the spacing of the space heaters, where they were, what the BTUs were, were they the same type. Totally irrelevant, totally."

"A trial court has wide discretion in admitting rebuttal testimony and in determining relevancy. . . . [R]ebuttal testimony is ordinarily limited to such purposes as refuting the defendant's evidence and impeaching or rehabilitating witnesses." (Citations omitted.) *Beinhorn* v. *Saraceno*, supra, 23 Conn. App. 493. "Relevant evidence" means "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "In considering whether a trial court has abused its discretion, appellate courts view such a trial court ruling by making every reasonable presumption in favor of the decision of the trial court." (Internal quotation marks omitted.) *Hackling* v. *Casbro Construction of Rhode Island*, supra, 67 Conn. App. 291–92.

Acker argues that Gregan testified that the space heaters at the defendants' facility were inadequate, and that he should have been permitted to question him regarding the space heaters used at Last Post because (1) "if a rescue facility in which he had a management role had used [space heaters], then the court could have concluded that the use by the defendants of those same devices was reasonable and that the use met the standard of care applicable to such rescue facilities"; and (2) it would impeach the credibility of Green's previous testimony that such space heaters were inadequate. We disagree.

First, testimony regarding the use of space heaters

in other facilities was not relevant to the issue of whether the defendants provided the animals at their facility adequate protection from the weather; the issue was not whether the use of space heaters *in general* is appropriate. Second, the proposed line of questioning did not bear on Gregan's credibility. Even if the facts as alleged by Acker were true, and Last Post did endure a fire as a result of space heaters, the testimony does not alter the credibility of Gregan's testimony that the space heaters alone were not adequate to heat an uninsulated building the size of the barn housing the defendants' dog rescue operation. On the record before us, we conclude that the court did not abuse its discretion in prohibiting the defendants' attorney's proposed line of questioning.

### III

### ACKER'S APPEAL—INJUNCTIVE RELIEF

Acker's last claim is that the court erred in granting the injunctive relief sought by the plaintiffs because the court's decision was based on an erroneous statement of law.[18] We disagree.

"A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand." (Citations omitted; internal quotation marks omitted.) *Advest, Inc.* v. *Wachtel*, 235 Conn. 559, 563, 668 A.2d 367 (1995).

Section 22-329a (g) (1) provides in relevant part: "If, after hearing, the court finds that the animal is neglected or cruelly treated, it shall vest ownership of the animal in any state, municipal or other public or private agency which is permitted by law to care for neglected or cruelly treated animals . . . ."

The following additional facts are relevant to our resolution of this issue. On the last day of hearings, the court informed the parties that due to the accelerated nature of the proceedings, issuing a temporary injunction would be superfluous.[19] The court indicated that its decision regarding the injunction would be permanent and would be based on all of the evidence offered at trial. Neither party objected to this procedure.

At the close of evidence on January 21, 2013, the court indicated that it would issue its decision on February 14, 2013. In its decision, the court stated: "The court, having found after six days of hearing, that the smaller breed dogs were neglected, pursuant to [§ 22-329a (g) (1)] hereby vests ownership of the smaller breed dogs [with the town]. . . . The court, having found after hearing that those dogs not of the smaller breeds were not neglected, pursuant to [§ 22-329a (g) (3)], will order

that said animals be returned to the defendant[s]."

The court's decision to grant injunctive relief with respect to the small dogs was based on its finding that the small dogs were neglected, as defined by § 22-329a, which incorporates by reference § 53-247, which sets forth specific types of behavior that constitute neglect. The court, having found that the smaller breed dogs were in fact neglected, was directed by § 22-329a (g) (1) to grant injunctive relief. Acker has not shown that the court abused its discretion in so ruling. We therefore conclude that the court exercised sound discretion in ruling on the plaintiffs' request for injunctive relief.

IV

TOWN'S CROSS APPEAL

We now address the town's claims on cross appeal. The town argues that the court erred in (1) differentiating between large and small breed dogs, and (2) concluding that the larger breed dogs were not neglected. We disagree.

A

The town first argues that the court erred in making determinations of neglect on the basis of the dogs' breed size and type of coat. We disagree.

The court's decision to differentiate between the dogs on the basis of their breed size and type of coat is well supported by the record. Both parties' veterinarians testified regarding the differences between large and small breed dogs' temperature needs. Davis, the town's veterinarian, testified that when Umstead asked him for advice about the temperature needed to maintain dogs, he told her that "a large husky . . . or a large furry dog would probably be fine in this weather, depending on the housing and the protection from rain and wind. But that small toy breeds . . . could be in significant danger [if] temperatures dropped into the 40s and 30s. And it wouldn't take long for a small dog to use up its ability to keep itself warm, particularly shorthaired dogs and depending on . . . the way [they are] being housed. And I said that . . . consistent shivering was something that she needed to look for as an indication, these animals were struggling to maintain their body temperature." Basak-Smith testified that "[i]t depends on the dog. I mean, you know, my [golden retrievers] used to like to [lie] out in the snow all day. They preferred that. . . . [I]t depends on the dog and their coat and their size . . . ." Basak-Smith noted that many of the smaller dogs came from California and South Carolina, and that because of their small size, type of coat, and the fact that they came from warmer climates, they might not have been as tolerant of colder temperatures.

We therefore conclude that the court properly made determinations of neglect on the basis of the dogs' breed

size and type of coat.

B

The town argues, in the alternative, that even if the court properly made determinations of neglect on the basis of the dogs' breed size and type of coat, the court improperly concluded that the larger breed dogs were not neglected. We disagree.

The following additional facts are relevant to our resolution of the town's claim. In its oral memorandum of decision, the court stated: "As to the remaining animals, including the larger dogs, dogs of thicker coats and dogs not of a smaller breed, as that term was used by . . . Davis, in light of the court's discussion herein of the applicable statutory and case law, this court finds that the [town] has not proven by a fair preponderance of the evidence that those canine animals were, under all of the facts and circumstances, neglected or that those dogs were in imminent danger on November 8, 2012."

Section 22-329a (b) provides in relevant part that "any animal control officer . . . may take physical custody of any animal upon issuance of a warrant finding probable cause that such animal is neglected or is cruelly treated in violation of section 22-366, 22-415, 53-247, 53-248, 53-249, 53-249a, 53-250, 53-251 or 53-252 . . . ." As discussed in part I A of this opinion, § 22-329a does not provide an independent definition or standard of neglect, but rather incorporates by reference the standards of the specific statutes enumerated therein.

Section 53-247 (a) provides in relevant part: "Any person who . . . deprives of necessary sustenance . . . any animal, or who, having impounded or confined any animal, fails to give such animal proper care or . . . fails to supply any such animal with wholesome air, food and water, or . . . having charge or custody of any animal . . . fails to provide it with proper food, drink or protection from the weather . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both . . . ." It is reasonable to conclude that the neglect referred to in § 22-329a includes the failure to provide necessary sustenance, proper care, wholesome air, food and water, and protection from the weather.

The town maintains that "[a]lthough a significant amount of testimony offered by both sides dealt with the temperature conditions during the seizure of the dogs on November 8, 2012, temperature, however, was not the only factor used by the [town] for seizing the dogs." The town contends that there was other evidence, presented at trial, which indicated that the larger breed dogs were neglected in that they were not provided "proper care" or "wholesome air, food and water . . . ." General Statutes § 53-247 (a). The town points to Umstead's testimony regarding the amount of food

and water available to the dogs, and the size of the crates and the sanitary conditions the dogs were kept in.[20] It also points to Davis' testimony regarding the lighting conditions in the barn, the small size of the crates in which the larger breed dogs were kept, and the repercussions of "[s]ignificant sensory deprivation . . . ."[21]

We cannot conclude as a matter of law that the town satisfied its burden of proof or that the court erred in concluding that it had not met its burden. We also note that contradictory testimony was offered at trial regarding the significance of the fact that Umstead did not observe food and water bowls in the individual dog crates. Fernandez testified that there was a feeding schedule and that the dogs were fed one to two times per day depending on their size. She also testified that every day employees took the dogs outside, provided the weather was appropriate, and put them in outdoor pens where water was always available, while the employees cleaned the indoor crates. At the end of the day, the employees moved the dogs back inside and put them back in the crates before leaving the facility. Basak-Smith testified that it was not uncommon for kennels and facilities like that of the defendants' not to keep food and water bowls in individual dog crates twenty-four hours a day. Basak-Smith testified that dogs should have water most of the time, but that it was better to have dogs on a feeding schedule rather than to give them twenty-four hour per day access to food in their crates due to the risk that they might overeat or spill their food.

We cannot conclude, however, as an appellate court, that the defendants failed to provide the larger breed dogs with "proper care" or "wholesome air, food and water" as required by § 53-247 (a). This was entirely a factual determination entrusted to the trial court.

The court's dispositional order, however, which directed the parties to determine among themselves which dogs were smaller breed dogs and which dogs were larger breed dogs, was insufficient.[22] The court made the order without giving the parties a compliance deadline and without providing an alternative means by which they could determine which dogs were smaller breed and which were larger breed dogs, should the parties have failed to agree. Without an agreement, and without an alternative procedure to determine the number and identities of the dogs that were smaller breed and larger breed dogs, the court's orders were impracticable because the plaintiffs had imprecise direction as to which dogs to keep in their custody and which to return to the defendants' custody.

On Acker's appeal, the judgment is reversed only with respect to the order directing the parties to determine which dogs were smaller breed dogs and which were larger breed dogs and the case is remanded for

further proceedings consistent with this opinion (1) to determine the exact number of dogs removed and currently in the town's possession, and (2) to identify those dogs currently in the town's possession who were adversely affected by the cold temperatures and those who were not. On the town's cross appeal, the judgment is affirmed.

In this opinion the other judges concurred.

[1] Of the two defendants, only Acker has appealed. For convenience, we refer to Acker and SPCA of Connecticut collectively as the defendants, and individually by name where necessary. The town has filed a cross appeal. For convenience, we refer to the town and Umstead collectively as the plaintiffs, and individually by name where necessary.

[2] As of the date of oral argument before this court, the parties had not reached an agreement regarding the exact number of dogs seized or the number and identities of the smaller breed dogs.

[3] The barn housing the defendants' dog rescue facility was situated on property in two towns—Bethlehem and Morris.

[4] The parties were unable to agree on the exact number of dogs seized. On the last day of trial the court instructed the parties to determine the exact number of dogs seized and then currently in the town's possession.

[5] The second count of the verified petition sought an order from the court precluding Acker from owning, possessing or controlling any animal and from leasing his property to possess or house animals. The court noted that the plaintiffs abandoned or withdrew that count at the start of closing argument to the trial court.

[6] Section 22-336-13 (a) of the Regulations of Connecticut State Agencies defines a dog pound as "a building provided and maintained by a city or town which is used for the detention and care of impounded dogs or other facilities including a licensed veterinary hospital or licensed commercial kennel which, through written agreement with the town, is used for the detention and care of impounded dogs."

The defendants are correct in their assertion that their facility is not technically a "dog pound."

[7] The court briefly summarized the factual basis for its decision as follows: "The court disagrees with . . . Basak-Smith, who opined that if the smaller dogs were not suffering from hypothermia, they were not neglected. Being kept in temperatures in or below the thirties, the [town] was not expected to wait until the smaller dogs passed . . . Basak-Smith's litmus test and reached a state of hypothermia, before [Umstead] seized the animals, which prevented such from occurring. . . . As . . . Davis testified, if the town didn't intervene when it did, he had serious reservations that the little dogs could survive one more night. He added that the little dogs needed care and protection from the cold, which was not being provided."

[8] A court is perfectly able to be guided by standards established for analogous situations. Regulations clearly establish a 55 degree Fahrenheit minimum temperature standard for municipal "dog pounds." It hardly matters to a dog if he is in a dog pound or a nonprofit animal rescue facility, so far as the ambient temperature is concerned.

[9] See footnote 6 of this opinion.

[10] Davis testified that he "observed many of the small, toy shorthaired breeds curled up on the floor of their kennels . . . [m]any of them curled up in a ball, shivering violently."

[11] Acker argues that no accurate temperature of the interior of the facility was taken because "[t]he only measurement of the [interior] temperature was undertaken by . . . Umstead using the [laser] temperature gun; she acknowledged taking her *initial* temperature of the 'inside' of the rescue facility through the exterior window of the [facility] . . . . That temperature reading, tak[en] from outside [the facility] and shot through a closed glass window, was the basis of the verbal warning she gave regarding temperature. . . . [At trial] . . . Umstead was presented with the manual for the [laser] temperature gun . . . which indicated that it could not read an interior temperature through a closed window. At no point in . . . Umstead's testimony did she indicate that [s]he calibrated the device, sent it for servicing or conducted any affirmative, objective test as to the accuracy of the alleged scientific instrument." (Citations omitted; emphasis added.)

We do not necessarily agree or disagree with Acker's argument that the interior facility temperature taken by this method may be unreliable. The

temperature reading taken externally, however, was not the only evidence presented at trial regarding the interior temperature of the facility. In fact, there was a great deal of other evidence regarding the interior temperature of the facility. Additionally, Acker, in his brief, uses the word "initial" in conjunction with the external temperature reading, indicating that he recognized that the external temperature reading was not the only temperature measurement taken by Umstead.

[12] Acker also argues that there was no proof that the temperature had a discernable medical impact on the dogs. He points to testimony from Davis that the dogs "weren't in terrible shape" at the time of the seizure, and testimony from Basak-Smith that, on the basis of his understanding of the types of dogs residing in the defendants' facility, they could sustain temperatures as low as twenty degrees.

Acker's argument is not dispositive of the legal issues presented in this case. Nowhere does our statutory, regulatory, or common-law scheme require an animal to be suffering from a present illness as a prerequisite to finding that the animal is neglected. Because the plaintiffs obtained a warrant and the case was instituted pursuant to § 22-329a (b), rather than § 22-329a (a), there was no need to show "imminent harm," as required by § 22-329a (a). Furthermore, Umstead testified that the small dogs were cold and shivering. Davis also testified that the smaller dogs were "shivering violently."

[13] Acker also claims that the court expressed a mathematically determined equation regarding the difference in exterior and interior temperatures which it applied in order to reach its finding regarding the interior temperature of the facility on November 8, 2012. He contends that after hearing testimony from kennel manager Fernandez, who was not present on the day of the seizure, regarding her observation of the difference in interior and exterior temperature, the court declared the following "formula": "And when she was there one time, the outside temperature was 40 to 50 degrees and the inside temperature was no lower than 50, causing me to think that if the outside temperature was 28 to 30 degrees, according to Fernandez, the defendant[s'] employee, the inside temperature would have been 38 to 40 degrees." Acker contends there was never any basis provided as to the accuracy of the formula proffered by the court. We disagree with this characterization of the court's statement. To take every statement made by the court in evaluating evidence as a pronouncement of a new rule or principle of law is to misunderstand the function of the court as trier of fact during a bench trial. Nowhere in the court's decision does it state that this observation regarding Fernandez' testimony was a formula to be used in making its findings of fact or reaching its conclusions of law regarding neglect of the animals. We therefore find Acker's argument unpersuasive.

[14] The doctrine of predictive neglect is rooted in child custody case law. "The doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred. . . . Thus, [a] finding of neglect is not necessarily predicated on actual harm, but can exist when there is a potential risk of neglect." (Internal quotation marks omitted.) *In re Joseph W.*, 305 Conn. 633, 644–45, 46 A.3d 59 (2012).

[15] Acker argues that the court erred in concluding, as a matter of law, that the doctrine of predictive neglect can be used to satisfy the neglect requirement under the animal seizure statute, § 22-329a. He argues that the policy underlying the doctrine of predictive neglect is rooted in child welfare cases and, as a matter of law, has not, and cannot, be applied in animal neglect cases.

Acker argues that alternatively, even if the doctrine of predictive neglect did apply under the animal neglect statute, the court employed an incorrect standard of proof. He contends that the standard of proof is not preponderance of the evidence, as employed by the court, but rather clear and convincing evidence. In support of his argument, he cites the child welfare case *In re Joseph W.*, 305 Conn. 633, 646, 46 A.3d 59 (2012), wherein our Supreme Court held that requiring predictive neglect to be proven only by a preponderance of the evidence that there is a "potential risk" of neglect violated the petitioner's right to due process. The plaintiffs argue that Acker "expressly waived the issue by conceding that the trial judge would be correct in his use of the fair preponderance of the evidence standard, as opposed to the clear and convincing evidence standard, when deciding the case."

[16] Since the parties' oral argument before this court, our Supreme Court has changed the prerequisites to obtaining *Golding* review. In *State* v. *Elson*, 311 Conn. 726, 754, 91 A.3d 862 (2014), our Supreme Court overruled the

"affirmative request" requirement articulated by this court in *State* v. *Elson*, 125 Conn. App, 328, 346, 353–54, 9 A.3d 731 (2010); id., 346 ("as a prerequisite to *Golding* review, a party must affirmatively request review pursuant to *Golding* in its main brief" [emphasis omitted]). According to our Supreme Court, "to obtain review of an unpreserved claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, a defendant need only raise that claim in his main brief, wherein he must 'present a record that is [adequate] for review and affirmatively [demonstrate] that his claim is indeed a violation of a fundamental constitutional right.' " *State* v. *Elson*, supra, 311 Conn. 754–55.

[17] We note that the defendants' offer of proof was clothed in language of professional negligence. This case was not one sounding in professional negligence. Although the offer of proof may have presented a degree of useful information and may have been marginally relevant, it was not directly relevant. Proof of the conduct of others does not prove one was not negligent; further, it is not clear that evidence regarding temperature was to be offered at all by Gonzalez. When the relevance is marginal, the court enjoys great discretion in considering countervailing factors such as consumption of time. See Conn. Code Evid. § 4-3.

[18] Acker argues that the court's decision granting the injunctive relief requested by the plaintiffs was based on two erroneous statements of law.

First, he argues that "the trial court based its finding of neglect (vis-á-vis the small breed dogs) upon the doctrine of 'predictive neglect,' which had never been disclosed to the defendants until the time the decision was announced." See footnote 15 of this opinion. In part I C of this opinion we explained that the court's conclusion that the smaller dogs were neglected, in violation of § 22-329a, rested on two independent grounds: (1) failure to provide "proper . . . protection from the weather" in violation of §§ 22-329a and 53-247 (a), and (2) the doctrine of predictive neglect. We concluded that the court's conclusion that the smaller dogs were neglected was properly supported by the first ground; therefore, we need not determine the validity of the court's second ground. Here, too, Acker's argument necessarily fails because we need not determine the validity of the court's second ground of predictive neglect.

Second, he argues that the court's finding of neglect was based on the court's use of an erroneous temperature standard that does not exist at law. In part I A of this opinion, we concluded that the court's conclusion that the smaller dogs were neglected was correct in law; accordingly, Acker's argument here fails.

[19] "It is not uncommon for a hearing on a temporary injunction to be converted, *with the consent of the parties*, to a hearing on a permanent injunction. See *Waterbury Hospital* v. *Connecticut Health Care Associates*, 186 Conn. 247, 248, 440 A.2d 310 (1982)." (Emphasis added.) *Doublewal Corp.* v. *Toffolon*, 195 Conn. 384, 392–93, 488 A.2d 444 (1985); id., 393 ("[a] trial court may not sua sponte transform applications that request temporary injunctions into proceedings on the merits of issuance or denial of permanent injunctions").

[20] Umstead testified that when she visited the defendants' facility she did not see any food or water containers in the dogs' crates. She also testified that when she visited the defendants' facility on October 17, 2012, that "there were about eighty small crates, some very small, some had a lot of dogs in them with feces and urine that they were in." According to Umstead, "[t]hese crates were way too small for [the dogs]; they need to be able to get up [and] turn around."

[21] Davis testified regarding his first impressions and actions on November 8, 2012: "I entered a dark, cold building with a high roof; when my eyes adjusted to the light I could see rows and rows of small transport kennels on the floor. I had a flashlight with me, so I immediately went around the building, got on my knees, and looked into each of these dark crates, looking at what was in, and just checking to see if—you know—what the conditions of the animals [were] initially, before anything happened, before animals were seized or a lot of people came in. . . . Some dogs, larger breed dogs, not apparently cold, but in crates so small they could barely turn in."

Davis testified that "[s]ignificant sensory deprivation"—caused by insufficient human contact, inadequate exposure to light, and the like—can result in behavioral problems.

[22] The court directed the parties to determine which of the dogs were small dogs: "The parties need to engage in a cooperative effort to identify those of the dogs that would be declared as smaller dogs or smaller breed dogs, and they need to do so promptly, as those animals should suffer no further delay in being placed with new families. A comparison of the

photographs and the medical records should resolve any disagreements as to the exact number [of dogs] removed and currently in the [town's] custody, that is, whether that number is sixty-three or sixty-five." There is no evidence in the record before us indicating that the parties met and agreed upon the number of dogs seized by the town, or identified which of those were smaller dogs or smaller breed dogs.

The court, in its oral ruling, also deemed the thickness of the dogs' coat to be significant. It is clear in context that the court attempted to create two categories: those dogs who were adversely affected by the cold and those who were not.

On the issue of which of the dogs were adversely affected by the cold, the evidence before this court is limited. This type of factual determination is best entrusted to a trial court.

---